IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Brian Wright, | ) | Case No. 3:23-cv-04978-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| Enviri Corporation, | ) | |
| *d/b/a Harsco Rail*, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on a motion for summary judgment filed by Defendant Enviri Corporation ("Harsco" or "Defendant"). [Doc. 62.] In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2), D.S.C., the case was referred to United States Magistrate Judge Paige J. Gossett for pre-trial proceedings.

On January 21, 2026, the Magistrate Judge issued a Report and Recommendation ("Report") recommending that the motion for summary judgment be granted in part and denied in part. [Doc. 80.] The Magistrate Judge advised the parties of the procedures and requirements for filing objections to the Report and the serious consequences if they failed to do so. [*Id*. at 24.] Plaintiff filed objections to the Report on February 4, 2026 [Doc. 86], and Defendant filed a reply on February 18, 2026 [Doc. 87]. For the reasons stated herein, the Court accepts the Report as modified.

## STANDARD OF REVIEW

The Magistrate Judge makes only a recommendation to this Court. The recommendation bears no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976).

The Court is charged with making a de novo determination of only those portions of the Report that have been specifically objected to, and the Court may accept, reject, or modify the Report, in whole or in part.  28 U.S.C. § 636(b)(1).  The Court will review the Report only for clear error in the absence of an objection.  *See Diamond v. Colonial Life & Accident Ins.,* 416 F.3d 310, 315 (4th Cir. 2005) (stating that "in the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation" (internal quotation marks omitted)).

## APPLICABLE LAW

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations

2

averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

## BACKGROUND

In ruling on a motion for summary judgment, the Court reviews the facts and reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426,

3

433 (4th Cir. 2013).  As the Magistrate Judge recounted, the summary judgment record reveals the following facts:[1]

> This matter arises out of [Plaintiff's] former employment as a materials processor with Harsco, a supplier for the railway industry that operates a production facility in West Columbia, South Carolina.  Harsco hired [Plaintiff], who is African-American, in September 2019.  [Plaintiff] alleges that beginning in July 2020, he was subjected to a hostile work environment based on purported racial harassment by three white co-workers: Joey Nelson, Kyle Shealy, and Arthus "Art" Herron.
>
> [Plaintiff] argues that the harassment began with an incident on Friday, July 24, 2020 between Nelson and [Plaintiff].  On that day, supervisor Jasmine Miller directed [Plaintiff] to bring a welding frame to Nelson.  Nelson found the frame to be unusable and directed [Plaintiff] to take it away.  When [Plaintiff] responded that he brought it at the direction of Miller, Nelson began cursing at [Plaintiff] to remove the frame.  Nelson also threatened [Plaintiff] and continued cursing, telling [Plaintiff] there would be problems if he did not get the frame out and suggesting he would physically "go after" him if [Plaintiff] did not listen to him again or drove off while he was speaking to him.  [Plaintiff] responded by suggesting they could take this matter out to the parking lot.  Upon hearing of the incident, Miller discussed it with [Plaintiff] and Nelson.  Nelson claimed that he was joking when he threatened [Plaintiff].  Sometime between the date of the incident and July 29, 2020, Nelson made an official report to Human Resources that [Plaintiff] had threatened him.  Nelson was suspended pending an investigation, and at the conclusion of the investigation on July 31, 2020, Nelson was terminated for "[f]ighting or instigating a fight on company property.  Maliciousness towards another employee(s)."
>
> Nelson was friends outside of work with Shealy and Herron.  [Plaintiff] argues that after Nelson was fired, they "were angry about [Nelson's] termination and sought revenge against [Plaintiff]."  There are general reports that Herron was watching [Plaintiff], asking people where [Plaintiff] was while

---

[1] The Court includes only those facts necessary to address Plaintiff's objections to the Report.  Moreover, the Court discusses certain facts in greater detail when addressing the merits of Plaintiff's objections.

at work, and purportedly telling an employee to watch out for [Plaintiff] and that [Plaintiff] cannot be trusted. Similarly, Shealy began tracking [Plaintiff's] schedule and whereabouts and started capturing video of [Plaintiff] at work. [Plaintiff] reported these instances to Human Resources. On October 19, 2020, Shealy received a verbal warning and was told to stop. When he did not, Shealy received a three-day suspension on November 9, 2020. Shealy was ultimately terminated on January 13, 2021 for his next infraction against a different individual.

There is no further evidence of harassment of [Plaintiff] by the above individuals following Shealy's November 2020 suspension.

[Doc. 80 at 2–3 (footnotes and citations omitted) (some alterations in original).] On April 27, 2022, Harsco terminated Wright for engaging in solicitation during scheduled work hours. [*Id.* at 4.]

Plaintiff filed a Complaint in the Lexington County Court of Common Pleas on September 1, 2023. [Doc. 1-1.] The Complaint alleged hostile work environment in violation of 42 U.S.C. § 1981; retaliation in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and § 1981; disparate treatment in violation of Title VII and § 1981; and violations of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 157. [Doc. 1-1 at 9–13.] Defendant removed the action to this Court on October 4, 2023. [Doc. 1.]

Remaining before the Court are Plaintiff's claims for disparate treatment, hostile work environment, and retaliation pursuant to § 1981 and retaliation pursuant to Title VII based on any discrete acts occurring on or after November 5, 2021.[2] Now pending before

---

[2] In October 2023, Plaintiff voluntarily dismissed his claims for disparate treatment in violation of Title VII and for violations of the NLRA by filing an Amended Complaint in response to Defendant's motion to dismiss and a stipulation of dismissal. [*See* Docs. 4; 5; 10.] In addition, the Court dismissed Plaintiff's retaliation claim under Title VII as time-

the Court is Defendant's motion for summary judgment as to Plaintiff's remaining claims. [Doc. 62; *see also* Docs. 63; 68; 71.]

## DISCUSSION

The Magistrate Judge recommends granting Defendant's motion for summary judgment as to Plaintiff's disparate-treatment and hostile-work-environment claims and denying Defendant's motion for summary judgment as to Plaintiff's retaliation claims. [Doc. 80.]  Regarding Plaintiff's hostile-work-environment claim, the Magistrate Judge concluded that Plaintiff forecasted insufficient evidence to generate genuine issues of material fact as to whether Defendant's unwelcome conduct was based on race or imputable to the employer.  [*Id.* at 8–18.]

As stated previously, the Court accepts the Report of the Magistrate Judge as modified herein.  Specifically, the Court accepts the Report's conclusions regarding Plaintiff's disparate-treatment and retaliation claims.  Regarding Plaintiff's hostile-work-environment claim, the Court accepts the Report's conclusions on different grounds: namely, Plaintiff has forecasted insufficient evidence to generate genuine issues of material fact as to whether the unwelcome conduct in question was severe or pervasive.

**Plaintiff's Disparate-Treatment and Retaliation Claims**

As an initial matter, Plaintiff does not oppose dismissal of any remaining disparate-treatment claim [Doc. 68 at 1], nor does he object to the Magistrate Judge's conclusion recommending the same [*see generally* Doc. 86].  Finding no clear error, the Court

---

barred to the extent it relies on any discrete acts that purportedly took place before November 5, 2021.  [Doc. 25.]

accepts the Report of the Magistrate Judge and grants Defendant's motion for summary judgment as to this claim.

In addition, Defendant filed no objections to the Magistrate Judge's conclusion recommending denial of summary judgment as to Plaintiff's retaliation claims. Finding no clear error, the Court accepts the Report of the Magistrate Judge and denies Defendant's motion for summary judgment as to these claims.

**Plaintiff's Hostile-Work-Environment Claim**

The elements of a hostile-work-environment claim "are the same under either § 1981 or Title VII." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001). To survive summary judgment, a plaintiff must generate triable issues that "(1) the harassment was unwelcome; (2) the harassment was based on [the plaintiff's race]; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." [3] *Causey v. Balog,* 162 F.3d 795, 801 (4th Cir. 1998). In determining whether the plaintiff can meet this burden, the court must apply "[c]ommon sense" and

---

[3] The Magistrate Judge purportedly situated the elements of Plaintiff's hostile-work-environment claim within the *McDonnell Douglas* burden-shifting framework. [*See* Doc. 80 at 8.] However, "[t]he *McDonnell Douglas* burden-shifting framework does not apply to hostile work environment claims." *Magassouba v. Prince George's County.*, 773 F. Supp. 3d 196, 224 (D. Md. 2025); *see also Guessous v. Fairview Prop. Invs., LLC,* 828 F.3d 208, 217–21 (4th Cir. 2016) (applying the *McDonnell Douglas* burden-shifting framework to the plaintiff's discrimination and retaliation claims but not to her hostile-work-environment claim); *Stewart v. MTR Gaming Grp., Inc.*, 581 F. App'x 245, 248 (4th Cir. 2014) (declining to apply the *McDonnell Douglas* burden-shifting framework to a hostile-work-environment claim where the plaintiff presented direct evidence of sexual harassment and there was thus "no facially legitimate action to consider"); *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 n.11 (3d Cir. 2017) ("We agree that the burden-shifting framework is inapplicable here because . . . there can be no legitimate justification for a hostile work environment.").

"appropriate sensitivity to social context" to the "constellation of surrounding circumstances." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998).

Defendant does not dispute the first element, unwelcome conduct. [*See generally* Docs. 62; 71; 87.] Moreover, Plaintiff does not specifically object to the Magistrate Judge's conclusions that Nelson and Herron's conduct did not create a hostile work environment. [*See generally* Doc. 86.] Accordingly, the Court will focus on the remaining elements as applied to the conduct of Shealy.

### *Whether the Unwelcome Conduct Was Based on Plaintiff's Race*

Regarding the second element, the Magistrate Judge concluded that "there is simply *no evidence* in the record linking Shealy's association with [the Ku Klux Klan and the Hells Angels] to the racially neutral conduct—the video recording—of which [Plaintiff] complains." [Doc. 80 at 10–11 (emphasis added).] The Court disagrees.

"[H]arassment need not be accompanied by a contemporaneous statement of [racial] animus to be actionable under [§ 1981]—rather, the connection between animus and conduct may be inferred from the totality of the circumstances." *Strothers v. City of Laurel*, 895 F.3d 317, 330–31 (4th Cir. 2018) (citing *Oncale*, 523 U.S. at 82). The court may consider facially race-neutral conduct where a "connection to or nexus with an obvious or overt racial incident" exists. *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1085 (8th Cir. 2010) (citing *Faragher v. City of Boca Raton*, 534 U.S. 775, 788 (1998)), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011); *see also McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 409 (4th Cir. 2022) ("[A] plaintiff cannot rely on her own 'conjecture' to impute a racial character to what appears to be neutral harassment"); *Alfano v. Costello,* 294 F.3d 365, 378 (2d Cir. 2002) (requiring

"some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory"). Incidents sharing a "congruency of person or incident" are more likely to be sufficiently connected. *Smith*, 625 F.3d at 1085. Conversely, incidents that are temporally remote and/or involve different actors are less likely to be sufficiently connected. *See McIver*, 42 F.4th at 409 (concluding that an employee's alleged tampering with the plaintiff's machine was insufficient to "create a pervasively hostile work environment over the entire relevant period" where the conduct occurred "long ago and in relative isolation"); *Morris v. Conagra Foods, Inc.,* 435 F. Supp. 2d 887, 908 (N.D. Iowa 2005) (concluding that race-neutral incidents of harassment identified by the plaintiff were not sufficiently connected to race-based incidents so as to imply discriminatory animus where the incidents did not involve the same harassers, were otherwise unrelated factually, and occurred more than seven months apart); *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 264 (E.D.N.Y. 2009) (finding that a racially derogatory comment uttered early in the plaintiff's years-long tenure did not "by itself constitute an adequate basis from which to infer that the facially race-neutral conduct of which [the] plaintiff complains was racially motivated"), *aff'd*, 371 F. App'x 115 (2d Cir. 2010).

Plaintiff presents the following facts to support his claim that Shealy's facially race-neutral conduct was actually race-based [*see* Docs. 68 at 4–6; 86 at 2–4]:[4]

---

[4] At the summary-judgment stage, the Court "may consider hearsay evidence submitted in an inadmissible form so long as the underlying evidence could be provided in an admissible form at trial." *Contrell v. Rubenstein,* No. 2:14-cv-174191, 2016 WL 5723601, at *8 (S.D.W. Va. Aug. 23, 2016). As the Magistrate Judge correctly concluded, many of the statements relied upon in Plaintiff's response to Defendant's motion for summary judgment constitute inadmissible hearsay because they involve multiple declarants. [Doc. 80 at 11–12; *see also* Docs. 68-9 ¶ 8; 68-10 ¶ 4; 68-39 at 25 (24:21–25).] That said, any below-referenced statements would be admissible at trial because they involve only one declarant and are not offered to prove the truth of the matter asserted.

- Prior to July 31, 2020, Nelson and Shealy made unspecified "jokes about black people" in the presence of Plaintiff. [Doc. 68-30 at 3–4 (56:8–57:19).]

- Nelson was terminated from Harsco on July 31, 2020 for instigating a fight with Plaintiff. [Doc. 68-2 at 43.] Nelson testified that he believed he was terminated because Jasmine Miller and Brittany Brown showed favoritism towards Plaintiff and because Brown is "married to a black guy and everybody else was black." [Doc. 68-29 at 4 (13:15–22).]

- Between Nelson's termination on July 31, 2020 and November 9, 2020, Shealy followed Plaintiff around the workplace and took videos of Plaintiff with his cellphone. Plaintiff reported Shealy's behavior on October 19, 2020, and November 9, 2020.[5] [Docs. 68-4 at 31, 40–41; 68-7; 68-8.]

- Between July 31, 2020 and November 9, 2020, Shealy told Plaintiff that he was a member of the KKK. [Doc. 68-30 at 12–13 (135:18–136:24); *see also* Doc. 68-32 at 3 (15:8–22).]

- Between July 31, 2020 and November 9, 2020, Shealy showed Plaintiff a photograph of himself wearing a white KKK uniform. [Doc. 68-30 at 12–13 (135:18–136:24).]

- Between July 31, 2020 and November 9, 2020, Shealy stated that he was a member of the Hells Angels, a biker gang. [Doc. 68-30 at 10 (106:1–25); *see also* Doc. 68-32 at 4 (16:4–20).]

- Between October 19, 2020 and November 9, 2020, Shealy saw Plaintiff sitting in his car in the Harsco parking lot on his lunch break, backed his car next to Plaintiff's, and recorded or pretended to record Plaintiff with his cellphone. When interviewed by a human resources officer on November 9, 2020, Shealy admitted that he intended for his conduct to "scare" Plaintiff. [Docs. 68-4 at 31, 40–41; 68-8.]

Viewing the evidence in the light most favorable to Plaintiff, the undersigned concludes that questions of fact remain as to whether Shealy's race-neutral conduct— following and recording Plaintiff with the intent to "scare him"—resulted from racial animus. In particular, the above-described race-based and race-neutral conduct involved

---

[5] Defendants concede that "[a]ny alleged hostile environment based on the conduct of [Shealy] would at most only have occurred between July 31, 2020 and November 9, 2020. [Doc. 63 at 7.]

10

the same actor—Shealy—and occurred within relatively narrow and overlapping timeframes. *See Smith,* 625 F.3d at 1085. First, Plaintiff testified that Nelson and Shealy made unspecified "jokes about black people" when they were together. [Doc. 68-30 at 3–4 (56:8–57:19).] Although Plaintiff's testimony would not aid a jury in evaluating the *severity* of Nelson and Shealy's race-based comments, it is nevertheless probative circumstantial evidence of racial animus. *Cf. Mills v. Cellco Part.*, 376 F. Supp. 3d 1228, 1242–43 (N.D. Ala. 2019) (concluding that the plaintiff sufficiently alleged frequent conduct even though she could only recall nine specific comments made by her manager and her other allegations about his allegedly offensive remarks were "vague"). Second, Nelson testified in his deposition that he believed his termination was motivated by racial biases within the company [Doc. 68-29 at 4 (13:13–22)], and Plaintiff reported Shealy's race-based and race-neutral conduct after Nelson was terminated [*see* Docs. 68-4 at 31, 40–41; 68-7; 68-8; 68-30 at 12–13 (135:18–136:24)]. Further, Plaintiff did not merely hear about Shealy's KKK affiliation secondhand; in his deposition, Plaintiff confirmed that Shealy told him about his KKK membership and showed him a photograph of him wearing his KKK uniform. [*See* Doc. 68-30 at 12–13 (135:18–136:24)]; *cf. Dickerson v. N.J. Dep't of Hum. Servs.,* 767 F. Supp. 605, 616 (D.N.J. 1991) (observing that "[t]he mere mention of the KKK" *to an African-American employee* "invokes a long and violent history sufficient to detrimentally affect *any* reasonable person" in the plaintiff's position).[6] Given the clear

---

[6] *See* Kelly J. Baker, *UChicago Voices Religion & Culture Forum*, "The Artifacts of White Supremacy," https://voices.uchicago.edu/religionculture/2017/06/14/813/ ("Imperial Wizard [William J. Simmons] admitted that some found the [KKK] uniforms 'grotesque and ghostly, *designed to intimidate and terrify persons against whom the displeasure of the Klan might be directed*.'" (quoting William J. Simmons, *The Klan Unmasked.* (Atlanta: W.E. Thompson Publishing Company, 1924), 87) (emphasis added)).

11

historical import of the KKK and the temporal proximity of the relevant conduct in question, a reasonable jury could evaluate the circumstantial evidence to conclude that Shealy's collective actions were racially motivated. *See Howerton v. Bd. of Educ. of Prince George's Cnty.,* No. TDC-14-0242, 2015 WL 4994536, at *14 (D. Md. Aug. 19, 2015) (finding that a reasonable jury could conclude that "at least some of the subsequent [race-neutral] acts of [the plaintiff's supervisor] were based on race" where the supervisor made earlier race-based comments); *Hicks v. Carilion Med. Ctr.,* No. 7:17-cv-00247, 2019 WL 1394390, at *4 (W.D. Va. Mar. 27, 2019) ("Granting [the plaintiff] an assumption of credibility and making all reasonable inferences in his favor, a reasonable factfinder could perhaps conclude that [a co-worker's] comments were racially motivated, given the racial make-up of the staff, the shift in [the plaintiff's] role, and the past incidents alleged.").

### *Whether the Unwelcome Conduct Was Severe or Pervasive*

Because the Magistrate Judge determined that the second and fourth elements were dispositive, she did not reach a conclusion as to whether the unwelcome conduct was severe or pervasive. The Court now concludes that Plaintiff has not met his burden on this element.

The severe or pervasive conduct that gives rise to an abusive work environment must be both objectively and subjectively "hostile" or "abusive." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22 (1993). An objective analysis of whether a workplace is hostile or abusive looks to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015)

12

(en banc) (internal quotation marks omitted). The ultimate inquiry is whether the conduct is so "extreme" that it "amount[s] to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788.

In addition to the evidence recounted above, Plaintiff claims that Shealy's conduct caused "stress, anxiety[,] and high blood pressure because of the emotional distress." [Doc. 68 at 18; *see also* Doc. 68-30 at 19–20 (163:13–164:12).]  To this end, Plaintiff visited Harsco's on-site nursing station and an external doctor's office [Doc. 68-30 at 19–20 (163:13–164:12)], and he "started taking off days after days after days at a time because [he] was stressed out" [*id.* at 20 (164:9–12)].

Here, Plaintiff has not forecasted sufficient evidence to show that Shealy's conduct was *objectively* severe or pervasive.  As previously stated, the undersigned certainly recognizes that "'[t]he mere mention of the KKK invokes a long and violent history sufficient to detrimentally affect *any* reasonable person of the same race as [Plaintiff].'" *Howard v. Blalock Elec. Serv., Inc.,* 742 F. Supp. 2d 681, 694 (W.D. Pa. 2010) (quoting *Dickerson,* 767 F. Supp. at 616).  That said, Plaintiff has not forecasted evidence of conduct by Shealy that was humiliating.  Nor has Plaintiff forecasted admissible evidence that Shealy—or the KKK itself—directly threatened Plaintiff or exercised physical violence against him.  Rather, Plaintiff merely surmises that Shealy desired to catch Plaintiff in a workplace violation and trigger his termination in retaliation for his involvement in Nelson's termination.  [*See, e.g.,* Doc. 68 at 2 ("Shealy . . . blamed [Plaintiff] for [Shealy's] friend's termination and . . . *subjected him to racial harassment in an effort to intimidate him and get him fired*." (emphasis added))]; *compare Spriggs,* 242 F.3d at 182, 184–86 (denying summary judgment where the plaintiff was exposed on a "continuous daily basis" to racial

13

insults made by a supervisor in which he called a number of African-American employees "monkey[s]", "dumb monkey[s]", and "ni * * * * *"), *and Collier v. Ram Partners, Inc.,* 159 F. Supp. 2d 889, 894–900 (D. Md. 2001) (denying summary judgment where the plaintiff was subjected to repeated racial epithets and physical threats)*, and Jackson v. Flint Ink N. Am. Corp.,* 382 F.3d 869, 870 (8th Cir. 2004) (denying summary judgment where, among other evidence, the plaintiff's name was written in a shower at his workplace with an arrow connecting his name to a burning cross and a KKK sign, as "an objective observer would regard this combination of figures as a threat of serious bodily harm if not death"), *with Sowash v. Marshalls of MA, Inc.,* No. 21-1656, 2022 WL 2256312, at *3–5 (4th Cir. June 23, 2022) (affirming the district court's conclusion that a co-worker's frequent non-sexual touching—without attendant evidence of sexual comments or propositions, office pranks, or demeaning statements directed at the plaintiff—did not rise to the level of a severe or pervasive work environment), *and Honor v. Booz-Allen & Hamilton, Inc.,* 383 F.3d 180, 190–91 (4th Cir. 2004) (affirming the grant of summary judgment to the defendant partly based on the plaintiff's failure to forecast sufficient evidence that unwelcome conduct was severe or pervasive where a supervisor once said she did not know how to work with black males, the plaintiff believed that the supervisor undermined the recruitment and careers of black employees, the plaintiff received a critical evaluation and personal attacks, but there was no evidence of racial slurs or epithets), *abrogated on other grounds by EEOC v. Consol Energy, Inc.,* 860 F.3d 131, 144 (4th Cir. 2017), *and Perkins v. Int'l Paper Co.,* 936 F.3d 196, 209 (4th Cir. 2019) (granting summary judgment to the defendant where the plaintiff presented evidence of a "handful of incidents" of mistreatment compared to white employees and two instances

14

of racially offensive conduct learned about secondhand), *and Howerton,* 2015 WL 4994536, at *15 (finding that none of the race-based comments of the plaintiff's supervisor "involved any racial slurs or racially charged language so offensive as to be 'physically threatening or humiliating'" and that the supervisor's later neutral conduct, even if attributed to racial animus, did not create a genuine issue of material fact as to severity), *and Jordan v. S.C. Dep't of Educ.,* No. 4:22-3345-JD-KDW, 2025 WL 3671972, at *15 (D.S.C. Jan 16, 2025) (granting summary judgment to the defendant where a co-worker made isolated race-based comments and flashed a KKK membership card at the plaintiff), *Report and Recommendation adopted by* 2025 WL 1065437 (D.S.C. Apr. 9, 2025)*, and Mills*, 376 F. Supp. 3d at 1242–44 (concluding that the plaintiff failed to forecast sufficient evidence showing that her manager's frequent racial remarks—including that he "'felt like KKK was one of the greatest organizations anyone could ever be in'" and would attend more meetings if he knew where they were—were severe or pervasive, where the manager's approving comments about the KKK occurred during a single conversation and the plaintiff was not otherwise physically threatened), *and Davis v. RealPage, Inc.*, No. 3:18-CV-0986-D, 2020 WL 1325201, at *18–19 (N.D. Tex. Mar. 20, 2020) (concluding that "[t]he conduct that a jury could reasonably find was frequent—*i.e.*, the following— was not severe, physically threatening, or humiliating" where the plaintiff submitted evidence that co-workers frequently followed her on walk breaks, to the restroom, and to the escalator and waited for her in the parking lot).

As previously stated, Plaintiff's testimony as to Nelson and Shealy's "jokes about black people" is too vague to aid a jury in evaluating the severity of the unwelcome conduct. Further, Shealy was ultimately subjected to effective progressive discipline for

his conduct [*see* Docs. 63 at 21–22 (145:21–146:18); 80 at 16], and the alleged harassment in question involved a co-worker, not a supervisor, *see McIver,* 42 F.4th at 408 ("[H]arassment by a supervisor tends to be more serious, while harassment by a co-equal is less serious."). For these reasons, the Court grants summary judgment in Defendant's favor on the hostile-work-environment claim.[7]

## CONCLUSION

For the reasons discussed, the Court accepts the Report and Recommendation of the Magistrate Judge as modified. Accordingly, Defendant's motion for summary judgment [Doc. 62] is GRANTED IN PART and DENIED IN PART. The motion is granted as to Plaintiff's disparate-treatment and hostile-work-environment claims and denied as to Plaintiff's retaliation claims.

IT IS SO ORDERED.

s/ Jacquelyn D. Austin
United States District Judge

March 31, 2026
Columbia, South Carolina

---

[7] Because the third element is dispositive, the Court need not address the fourth element, whether the unwelcome conduct was imputable to the employer. That said, the Court acknowledges that Plaintiff allegedly complained about Shealy's conduct "at least six time[s]" prior to Harsco's first disciplinary action against Shealy on October 19, 2020. [Doc. 68-36 at 1.] The Court agrees with the Magistrate Judge that, with regard to any of Plaintiff's reports made *on or after* October 19, 2020, Harsco's response was reasonably calculated to end the harassment and, therefore, reasonable as a matter of law. *See E.E.O.C v. Xerxes Corp.,* 639 F.3d 658, 670 (4th Cir. 2011) ("A remedial action that effectively stops the harassment will be deemed adequate as a matter of law" (internal quotation marks omitted)); *but see id.* at 671 ("[The defendant] disputes that complaints of racial harassment were made . . . prior to the February 3, 2006 incident . . ., but a jury could reasonably credit the testimony of [two workers who claimed that they lodged complaints in June 2005 and November 2005] and conclude otherwise.").